**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DAVID GORDON, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| GENESEE & WYOMING INC., JOHN C. HELLMANN, OIVIND LORENTZEN III, GEORGE R. OLIVER, ANN N. REESE, JOSEPH H. PYNE, MARK A. SCUDDER, ALBERT J. NEUPAVER, RICHARD H. BOTT, HUNTER C. SMITH, BRUCE J. CARTER, and CYNTHIA L. HOSTETLER, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

Plaintiff David Gordon ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Genesee & Wyoming Inc. ("G&W" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants" and, together with G&W, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between G&W and Brookfield Infrastructure, GIC, and Brookfield Infrastructure's institutional partners (collectively, the "Consortium").

2.      On July 1, 2019, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive $112 in cash for each share of G&W stock they own (the "Merger Consideration").

3.      On August 5, 2019, in order to convince G&W shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form PREM14A Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.  The materially incomplete and misleading Proxy violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. 240.14a-9), each of which constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act.  On August 20, 2019, the Company filed a Form DEFM14A Definitive Proxy Statement that did not correct the materially incomplete and misleading nature of the Proxy. The Board has scheduled a special meeting of the Company's shareholders on October 3, 2019 to vote on the Proposed Transaction.

4.      While touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the Proxy materially incomplete and misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that G&W shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by G&W's financial advisors, BofA Securities, Inc. ("BofA") and Morgan Stanley & Co. LLC ("Morgan Stanley") in

support of their opinions that the Merger Consideration is fair to shareholders, on which the Board relied.

6.     It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to G&W shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because G&W is incorporated in this District.

**PARTIES**

11.    Plaintiff is, and at all relevant times has been, a holder of G&W common stock.

12.    Defendant G&W is incorporated in Delaware and maintains its principal executive offices at 20 West Avenue, Darien, Connecticut 06820.  The Company's common stock trades on the NYSE under the ticker symbol "GWR."

13.    Individual Defendant John C. Hellmann is G&W's Chairman, President and Chief Executive Officer and has been a director of G&W since January 2006.

14.    Individual Defendant Oivind Lorentzen III is G&W's lead director and has been a director of G&W since August 2006.

15.    Individual Defendant George R. Oliver has been a director of G&W since November 2013.

16.    Individual Defendant Ann N. Reese has been a director of G&W since February 2012.

17.    Individual Defendant Joseph H. Pyne has been a director of G&W since September 2015.

18.    Individual Defendant Mark A. Scudder has been a director of G&W since January 2003.

19.    Individual Defendant Albert J. Neupaver has been a director of G&W since September 2015.

20.    Individual Defendant Richard H. Bott has been a director of G&W since October 2012.

21.    Individual Defendant Hunter C. Smith has been a director of G&W since March 2015.

22.    Individual Defendant Bruce J. Carter has been a director of G&W since April 2018.

23.    Individual Defendant Cynthia L. Hostetler has been a director of G&W since April 2018.

24.    The Individual Defendants referred to in paragraphs 13-23 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

25.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of G&W (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

26.    This action is properly maintainable as a class action because:

a.    The Class is so numerous that joinder of all members is impracticable. As of July 29, 2019, there were approximately 59,000,000 shares of G&W common stock outstanding, held by hundreds of individuals and entities scattered throughout the country. The actual number of public shareholders of G&W will be ascertained through discovery;

b.    There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)    whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly

comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)    whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act;

iii)    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.    The Proposed Transaction**

27.    G&W owns or leases 120 freight railroads worldwide that are organized into operating regions.  The North American regions serve 41 U.S. states and four Canadian provinces. G&W's Australian Region serves New South Wales, the Northern Territory and South Australia. The Company's U.K./European Region includes the United Kingdom's largest rail maritime intermodal operator and the second-largest freight rail provider, as well as regional rail services in Continental Europe.

28.    On July 1, 2019, G&W and the Consortium issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

> DARIEN, Conn.--(BUSINESS WIRE)--Genesee & Wyoming Inc. (NYSE:GWR) ("G&W"), together with Brookfield Infrastructure (NYSE: BIP; TSX: BIP.UN), GIC and Brookfield Infrastructure's institutional partners (together referred to as the "Consortium"), are announcing an agreement pursuant to which affiliates of Brookfield Infrastructure and GIC will acquire G&W in a transaction valued at approximately $8.4 billion including debt (the "Transaction"). The Transaction will result in G&W becoming a privately held company. Under the new ownership, G&W will continue to focus on world class safety and outstanding service, while pursuing the company's strategic goals.
>
> G&W owns a portfolio of 120 short line railroads, predominantly in North America, with operations in Europe and Australia. Through its subsidiaries worldwide, the business provides transportation infrastructure services over more than 26,000 kilometers of track, providing access to its well-diversified customer base.
> "We believe this transaction is an excellent outcome for all G&W stakeholders," said Jack Hellmann, G&W Chairman and Chief Executive Officer. "For our current stockholders, the sale price realizes significant value and represents a 39.5% premium to our March 8th share price. And for long-term investors who have owned our shares for the past two decades, the sale price represents a return of more than 5,400%."
>
> "For our customers, employees, and Class I partners, the long-term investment

horizon of Brookfield Infrastructure and GIC as seasoned infrastructure investors is perfectly aligned with the long lives of G&W railroad assets, which are integral to the local economies that we serve in North America and around the world," Hellmann continued. "They are also fully supportive of our business plan, which will continue to be focused on safety, customer service, and growing our footprint to provide more opportunity for our people. We also expect this transaction will allow us to further enhance our business as we benefit from Brookfield Infrastructure/GIC's expertise in real estate and technology, as well as relationships with their rail-centric/complementary portfolio companies."

"This is a rare opportunity to acquire a large-scale transport infrastructure business in North America," said Sam Pollock, Chief Executive Officer of Brookfield Infrastructure. "G&W will be a significant addition to our global rail platform and will expand our presence in this sector to four continents. G&W provides critical transportation services to more than 3,000 customers, and its cash flows have proven to be highly resilient over many years. Brookfield Infrastructure is well suited to work with the company to continue to improve the business, given our significant experience owning and operating rail, ports and other large scale, transportation infrastructure businesses."

Ang Eng Seng, Chief Investment Officer for Infrastructure at GIC, said, "As a long-term investor, GIC is confident G&W will continue to generate steady profitability, given its diversified operations and customer base. We look forward to partnering with G&W's management and Brookfield Infrastructure to support the future growth of the company."

**Transaction Details**

Pursuant to the agreement, each issued and outstanding share of G&W will be converted into the right to receive $112 per share in cash. The Transaction price of $112 per share of G&W common stock represents a 39.5% premium to the unaffected per share price of $80.28 on March 8, 2019, the day prior to initial media speculation of a potential transaction.

The Transaction is expected to close by year end or early 2020 and is subject to customary closing conditions, including approval by G&W stockholders holding 66 2/3% of the outstanding common stock, required regulatory approvals that include approval by the Committee on Foreign Investment in the United States, the U.S. Surface Transportation Board, and certain competition and antitrust approvals. Due to the pending sale, G&W will cease reporting monthly carloads and will not hold a conference call for its second quarter 2019 financial results. G&W expects to file its second quarter 2019 10-Q by close of business on August 9, 2019.

**Funding**

Brookfield Infrastructure's investment will be approximately $500 million of

equity. The remainder of the business will be owned by Brookfield Infrastructure's institutional partners and GIC. Brookfield Infrastructure's investment will be funded from existing liquidity which totaled approximately $1.9 billion at June 30, 2019.

**Advisors**

Citigroup Global Markets Inc. is serving as financial advisor to the Consortium. White & Case LLP is serving as lead legal advisor to the Consortium, along with McCarthy Tétrault LLP, Gilbert + Tobin and Steptoe & Johnson LLP who are also serving as legal advisors to the Consortium. Torys LLP is serving as legal advisor to Brookfield Infrastructure and Sidley Austin LLP is serving as legal advisor to GIC. Financing for the Consortium will be led by a syndicate of banks including Credit Suisse, Wells Fargo Securities, LLC, Citigroup Global Markets Inc. and RBC Capital Markets.

BofA Merrill Lynch and Morgan Stanley & Co LLC served as financial advisors to G&W. Simpson Thacher & Bartlett LLP, as well as Addleshaw Goodard LLP, Allens, Clark Hill PLC, Macfarlanes LLP and Stikeman Elliott LLP served as legal advisors to G&W. In addition, Wachtell, Lipton, Rosen & Katz served as counsel to G&W's board of directors.

**Genesee & Wyoming Inc. (G&W)** owns or leases 120 freight railroads organized in eight locally managed operating regions with approximately 8,000 employees serving 3,000 customers.

- G&W's six North American regions serve 41 U.S. states and four Canadian provinces and include 114 short line and regional freight railroads with more than 13,000 track-miles.
- G&W's Australia Region serves New South Wales, the Northern Territory and South Australia and operates the 1,400-mile Tarcoola-to-Darwin rail line. The Australia Region is 51.1% owned by G&W and 48.9% owned by a consortium of funds and clients managed by Macquarie Infrastructure and Real Assets.
- G&W's UK/Europe Region includes the U.K.'s largest rail maritime intermodal operator and second-largest freight rail provider, as well as regional rail services in Continental Europe.

G&W subsidiaries and joint ventures also provide rail service at more than 40 major ports, rail-ferry service between the U.S. Southeast and Mexico, transload services, contract coal loading, and industrial railcar switching and repair.

For more information, visit gwrr.com.

**Brookfield Infrastructure Partners** is a leading global infrastructure company that owns and operates high quality, long-life assets in the utilities, transport, energy

and data infrastructure sectors across North and South America, Asia Pacific and Europe. We are focused on assets that generate stable cash flows and require minimal maintenance capital expenditures. Brookfield Infrastructure Partners is listed on the New York and Toronto stock exchanges. Further information is available at www.brookfieldinfrastructure.com.

Brookfield Infrastructure is the flagship listed infrastructure company of Brookfield Asset Management, a leading global alternative asset manager with over $365 billion of assets under management. For more information, go to www.brookfield.com

**GIC** is a leading global investment firm established in 1981 to manage Singapore's foreign reserves. As a disciplined long-term value investor, GIC is uniquely positioned for investments across a wide range of asset classes, including equities, fixed income, private equity, real estate and infrastructure. In infrastructure, GIC's primary strategy is to invest directly in operating assets with a high degree of cash flow visibility and which provide a hedge against inflation. GIC has investments in over 40 countries. Headquartered in Singapore, GIC employs over 1,500 people across 10 offices in key financial cities worldwide. For more information on GIC, please visit www.gic.com.sg or LinkedIn.

29.    G&W is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

30.    If the false and/or misleading Proxy is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e., the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.    The Materially Incomplete and Misleading Proxy

31.    On August 5, 2019, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction.  The Proxy solicits the Company's shareholders to vote

in favor of the Proposed Transaction. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act. On August 20, 2019, the Company filed a definitive proxy that did not correct the materially incomplete and misleading nature of the Proxy and therefore continues to violate Sections 14(a) and 20(a) of the Exchange Act.

### The Materiality of Financial Projections

32.     A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction. Here, the Proxy discloses "G&W's senior management prepared and provided to the G&W Board and to BofA Merrill Lynch and Morgan Stanley certain non-public financial forecasts . . . ." Proxy 69.

33.     The Proxy includes two sets of projections: the updated projections presented to the Board on February 1, 2019 (the "Financial Projections") and the set of projections given to potential bidders in the confidential information package (the "CIP Projections"). *Id.* The CIP Projections include assumptions not in the Financial Projections including "fully achiev[ing] operational and cost improvement initiatives, successfully complet[ing] specific technology projects and effectively deploy[ing] $300,000,000 of capital in each of 2019, 2020 and 2021 for acquisitions and new business investments assuming that G&W would be able to achieve a return consistent with prior investments. . . ." *Id.*

34.    When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101). Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions. In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K. *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

35.    Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format." 17 C.F.R. § 229.10(b). Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items." 17 C.F.R. § 229.10(b)(2).

36.    In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

(i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

(ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual

results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

37.     Here, G&W's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that in making its recommendation that shareholders vote in favor of the Proposed Transaction, the Board specifically relied on the financial forecasts to determine that the "G&W Board considered that none of [the strategic alternatives], on a risk-adjusted basis, was reasonably likely to create value for G&W stockholders greater than the merger consideration."  Proxy 51.

38.     As discussed further below, the non-GAAP financial projections used do not provide G&W's shareholders with a materially complete understanding of the assumptions and key factors considered in developing the financial projections, which assumptions, factors and other inputs the Board reviewed.

***The Financial Projections Relied on by the Board***

39.     The Proxy discloses "G&W's senior management prepared and provided to the G&W Board and to BofA Merrill Lynch and Morgan Stanley certain non-public financial forecasts . . . ."  *Id.* at 69.

40.     The Proxy further discloses that the assumptions used in the financial projections were "reasonable at the time the Projections were prepared, taking into account the relevant information available to management at the time."  *Id.* at 70.

41.     The Proxy goes on to disclose, *inter alia*, forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2019 through 2023 for: (1) Adjusted EBITDA and (2) unlevered free cash flow but fails to provide (i) the line items used to calculate these non-GAAP metrics nor (ii) a reconciliation of these non-GAAP projections to

the most comparable GAAP measures.  *Id.* at 69-70. The Proxy also discloses a second set of Adjusted EBITDA projections from 2019 through 2028, but still fails to provide the line items nor a reconciliation to the most comparable GAAP measure.  *Id.* at 70.

42.    The Proxy defines Adjusted EBITDA as "earnings before interest expense, provision for income taxes, depreciation and amortization and after costs related to equity-based compensation, as adjusted to exclude restructuring charges as well as other non-recurring items typically identified in G&W's financial statements." *Id.* at 69 n.2.  Nevertheless, the Proxy fails to disclose the line items used to calculate Adjusted EBITDA, rendering the use of Adjusted EBITDA in the Proxy materially false and/or misleading.  *Id.*

43.    The Proxy defines unlevered free cash flow ("UFCF") as "Adjusted EBITDA less estimated cash taxes (net of the benefit of tax credits), Capital Expenditures, cash restructuring costs, pension service costs, equity investments in joint ventures and other cash flow items."  *Id.* at 70 n.4.  Nevertheless, the Proxy fails to disclose the line items used to calculate UFCF, rendering the use of UFCF in the Proxy materially false and/or misleading.  *Id.* at 69.

44.    Thus, the Proxy's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

45.    The non-GAAP financial projections disclosed on page 69-70 of the Proxy violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those

non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading as without any correlation with their GAAP equivalent financial metrics, and as a result, shareholders are unable to discern the veracity of the financial projections.

46.     As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

### *The Financial Projections Violate Regulation G*

47.     The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]

48.     Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes

---

[1]     Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

[2]     Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]     SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

"this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

49.    Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]  Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as G&W included in the Proxy here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

50.    The SEC has required compliance with Regulation G, including reconciliation

---

[4]    SEC, *Final Rule.*

[5]    *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com /2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[6]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

requirements in other merger transactions.  *Compare Youku Tudou Inc., et al.*, Correspondence 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

51.    Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the Proxy into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

---

[7]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

[8]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

[9]    *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm.  *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename 1.pdf.  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4.  The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.    The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflect the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such at the Proposed Transaction is incorrect. The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml.

***The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9***

52.    In addition to the Proxy's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures. Nor can shareholders compare the Company's financial prospects with similarly situated companies.

53.    Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading for the reasons discussed above. Indeed, Defendants acknowledge that "[n]on-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by G&W may not be comparable to similarly titled amounts used by other companies." Proxy 72.

54.    Additionally, the timing of the Financial Projections and CIP Projections and the fact that only the lower Financial Projections were approved for the financial advisors use makes the reconciliation of the non-GAAP metrics, or at least full disclosure of the inputs, necessary for shareholders to accurately understand the value of the Company.

55.    On November 9, 2018, after approving a new $500 million share repurchase program on October 25, 2018, the Company received a call from a U.S. activist investment firm stating that the investor has recently taken a significant position in the Company. *Id.* at 39.  The investor was interested in requesting a meeting with the Company's management to discuss, among other things, G&W's operations, capital allocation and portfolio alignment. *Id.*

56.    On December 20, 2018, the investor delivered a letter to the Company stating that

it owned (in partnership with a short-line railroad holding company) 9.7% of the Company's common stock and economic equivalents and had suggestions regarding the Company's recent performance, areas for potential operational improvement based on the operations of another U.S. railroad holding company and potential strategic alternatives that G&W could undertake.  *Id.* at 40.  The letter also indicated the investor would be willing to enter into a confidentiality agreement to facilitate further discussions.  *Id.*  Although the letter was never disclosed, from what was disclosed in the Proxy, it appears the investor was interested in the Company engaging in a sales process.

57.    On January 21, 2019, the Board met and, among other things, discussed the conversations with the investor and reviewed the terms of the draft confidentiality agreement received from the investor (which was ultimately executed on February 28, 2019).  *Id.* at 41.

58.    On February 1, 2019, the Company's management reviewed with the Board the final draft of the Financial projections.  *Id.*  During the course of February 2019, G&W management finalized the Financial Projections.  *Id.* at 42.  Starting on March 22, 2019, potential bidders who had signed a confidentiality agreement were able to receive a confidential information package which included the CIP Projections.  *Id.* at 43.

59.    The CIP Projections include assumptions not in the Financial Projections including "fully achiev[ing] operational and cost improvement initiatives, successfully complet[ing] specific technology projects and effectively deploy[ing] $300,000,000 of capital in each of 2019, 2020 and 2021 for acquisitions and new business investments assuming that G&W would be able to achieve a return consistent with prior investments . . . ."  *Id.* at 69.  The Proxy states the assumptions were not included in the Financial Projections because the additional assumptions were "uncertain."  *Id.*  However, the Proxy clearly states that the Financial Projections are also "uncertain."  *Id.* at 70.

60.    The Proxy does not provide any difference to the level of uncertainty in the additional assumptions.  Moreover, it is not clear why the CIP Projections weren't approved for the financial advisor's use along with the Financial Projections.  Certainly, the financial advisors would have been able to apply a discount rate that would adequately price the risk of the additional assumptions.

61.    As the Financial Projections and CIP Projections were finalized shortly after the Board received the letter from the institutional investor, it is not clear that the Financial Projections did not include the additional assumptions simply to facilitate the transaction and allow for positive fairness opinions.  Indeed, revenue and Adjusted EBITDA were substantially higher in each year in the CIP Projections as compared to the Financial Projections.  *Id.* at 69-70.  Although UFCF was not calculated for the CIP, presumably UFCF would have also been greater, ceteris paribus, as the CIP Projections' Adjusted EBITDA increased at a greater rate than the capital expenditures (the only two disclosed line items of UFCF) when compared to the corresponding year in the Financial projections.  *Id.*  Substituting the higher numbers into the financial advisors' analyses would make the merger consideration seem less attractive, ceteris paribus.

62.    Since both sets of financials were finalized shortly after discussions with the investor (and there was no further mention of the investor in the Proxy) it is unclear how much influence, if any, the investor's presence had on the Board's decision to create two separate sets of projections and only authorize the financial advisors to use the lower sets.  Therefore, since there is no indication in the varying levels of uncertainty between the two sets of projections and the financial advisors did not analyze the CIP Projections, in order for shareholders to be able to become fully informed regarding the value of their shares, the Company must provide a reconciliation of the non-GAAP metrics, or at least full disclosure of the inputs.

63.     As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

64.     In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 69-70, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

### *The Materially Misleading Financial Analyses*

65.     The summary of the valuation methodologies utilized by BofA and Morgan Stanley, including the utilization of certain of the non-GAAP financial projections described above by BofA and Morgan Stanley, in connection with their valuation analyses, (*id.* at 55-56, 62) is misleading in violation of Regulation 14a-9.  The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently.  Once a Proxy discloses internal projections relied upon by the Board, those projections must be complete and accurate.

66.     Over the past two years, BofA has received approximately $320 million in fees from services provided to the Consortium and its affiliates.  *Id.* at 61.  The Proxy fails to disclose the timing and nature of the past services BofA has provided to the Consortium and its affiliates. This is material as BofA clearly has a substantial relationship with the Consortium and shareholders need to know what the relationship entails to decide how much merit to give BofA's fairness opinion.

67.     Over the past 30 months, Morgan Stanley has received approximately $75 million to $120 million in fees from services provided to the Consortium and its affiliates.  *Id.* at 68.  The Proxy fails to disclose the timing and nature of the past services Morgan Stanley has provided to the Consortium and its affiliates.  This is material as Morgan Stanley clearly has a substantial

relationship with the Consortium and shareholders need to know what the relationship entails to decide how much merit to give Morgan Stanley's fairness opinion.

68.     BofA and Morgan Stanley both performed discounted cash flow analyses ("DCF") on the Company.  With respect to BofA's *Discounted Cash Flow Analysis*, the Proxy states that BofA performed a DCF analysis on the UFCF the Company was expected to generate during the third and fourth quarters of fiscal year 2019 through fiscal year 2023 based on the Financial Projections.  *Id.* at 59.  BofA calculated a range of terminal values by applying both perpetuity growth rates ranging from 2.5% to 3.0% and by applying last twelve months ("LTM") EBITDA exit multiples ranging from 10.0x to 11.5x to the Company's fiscal year 2023 estimated Adjusted EBITDA.  *Id.*  The UFCF and terminal values were discounted using discount rates ranging from 7.75% to 9.50%, based on G&W's weighted average cost of capital.  *Id.*  BofA then deducted net debt to derive the equity values. *Id.*

69.     The Proxy does not disclose whether BofA or the Company calculated the UFCF values, the calculated range of terminal values using either perpetuity growth rates or LTM EBITDA exit multiples, any of the inputs that went into calculating the Company's weighted average cost of capital, the inputs and assumptions that went into the selection of the perpetuity growth rate range or the selection of the LTM EBITDA exit multiple range, how stock-based compensation was treated, nor the net debt nor the fully diluted shares outstanding.

70.     With respect to Morgan Stanley's *Discounted Cash Flow Analyses*, Morgan Stanley performed a DCF analysis on the UFCF the Company was expected to generate during the second, third and fourth quarters of fiscal year 2019 and each of fiscal year 2020 through 2023 based on the Financial Projections.  *Id.* at 66.  Morgan Stanley calculated a range of terminal values by applying aggregate value to last twelve months EBITDA ("AV/LTM EBITDA") exit multiples

ranging from 10.0x to 11.0x. *Id.* Morgan Stanley then discounted the UFCF and terminal values by applying a discount rate range of 7.1% to 8.6%, which reflected G&W's weighted average cost of capital. *Id.*

71.    The Proxy does not disclose whether Morgan Stanley or the Company calculated the UFCF values, the calculated range of terminal values, any of the inputs that went into calculating the Company's weighted average cost of capital, the inputs and assumptions that went into the selection of the AV/LTM EBITDA exit multiple range, how stock-based compensation was treated, what, if any, enterprise adjustments were made, nor the fully diluted shares outstanding.

72.    Since information was omitted, shareholders are unable to discern the veracity of both BofA's and Morgan Stanley's discounted cash flow analyses. Without further disclosure, shareholders are unable to compare both BofA's and Morgan Stanley's calculations with the Company's financial projections. The absence of any single piece of the above information renders both BofA's and Morgan Stanley's discounted cash flow analyses incomplete and misleading. Thus, the Company's shareholders are being materially misled regarding the value of the Company.

73.    As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value . . . " *Id.* (footnote omitted). As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . . The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

74.     Moreover, it is not even clear that BofA and Morgan Stanley used the same UFCF values in their DCF analyses. BofA only used the third and fourth quarter of 2019 when performing its DCF analysis while Morgan Stanley used the second, third and fourth quarters. Proxy 59, 66.

75.     Therefore, in order for G&W shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

76.     In sum, the Proxy independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading. As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Transaction from G&W shareholders.

77.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

78.     Further, failure to remedy the deficient Proxy and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

79.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

80.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any [Proxy] or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

81.     As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a). SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a).

82.    The failure to reconcile the non-GAAP financial measures included in the Proxy violates Regulation G and constitutes a violation of Section 14(a).

83.    As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

84.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

85.    SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

86.    Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

87.    Defendants have issued the Proxy with the intention of soliciting shareholder

support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

88.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

89.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

90.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

91.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required

to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

92.     G&W is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

93.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

94.     As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

### COUNT III

**(Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)**

95.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

96.     The Individual Defendants acted as controlling persons of G&W within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of G&W, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and

control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

97.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

98.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing the Proxy.

99.    In addition, as the Proxy sets forth at length, and as described herein, that the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

100.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

101.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these

Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.    Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing and to award damages arising from proceeding with the Proposed Transaction;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.    Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  August 21, 2019

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By: _/s/ Michael Van Gorder_
Michael Van Gorder (#6214)
3828 Kennett Pike, Suite 201
Wilmington, DE 19807

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**

Nadeem Faruqi
James M. Wilson, Jr.
685 Third Avenue, 26th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com
        jwilson@faruqilaw.com

*Counsel for Plaintiff*

Tel.: (302) 482-3182
Email: mvangorder@faruqilaw.com

*Counsel for Plaintiff*

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, David Gordon ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against Genesee & Wyoming Inc. ("Genesee") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in Genesee's securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 20th day of August, 2019.

*David Gordon*
David Gordon

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 01/17/19 | 250 |
|  |  |  |
|  |  |  |